Good morning. May it please the court, counsel. My name is Helen Bruner. I'm here to represent the United States in this government appeal. On December 14, 1999, Ahmed Ressam was arrested when he attempted to smuggle explosives into the United States. He made those explosives to detonate them at the Los Angeles International Airport at the Millennium. Ressam came perilously close to achieving the substantial death and destruction and disruption of this country's transportation infrastructure that was his goal. The sole issue presented now is whether, in light of the totality of the circumstances of this case, the district court abused its discretion by imposing an unreasonable sentence. Here, we believe the record establishes the district court did indeed commit clear error of judgment in weighing the factors in 3553A to arrive at Ressam's sentence. Specifically, the district court overstated Ressam's history and characteristics, that is, his post-trial cooperation and conditions of confinement, and understated a variety of other factors, including the need for the sentence to reflect the seriousness of Ressam's crime and the need to promote respect for law to provide punishment and adequate deterrence. Let me start by addressing the subject of Mr. Ressam's cooperation, because that was primarily the basis for the district court's extraordinary deviation from the applicable guidelines range. The record demonstrates that Judge Kunawer failed to consider two important facts that have bearing on the weighing process and weighing of Mr. Ressam's cooperation. First, there's nothing in the record to indicate that the district court considered the fact that Ressam had just recanted all of his statements during that sentencing hearing. There's also nothing in the record to suggest that the district court considered the recantations that were contained in letters that had been earlier sent by Mr. Ressam concerning Mukhtar Harari, the individual against whom he testified in New York. Is it your position, the government's position, that when a district court has an enormous amount of information in front of it, as this district judge did, including all the information he got trying the case, receiving letters, receiving motions by the government at one point to go down in terms of the sentence, etc., etc., that the district judge, in passing his sentence, when he's going through and telling us he's considered the facts, has to refer to every single fact that the government pointed out, or else he's erred and we should reverse him? In other words, the district judge doesn't say A, B, C, D, E, F, G, and refer to every fact, as opposed to saying, look, I understand what this case is about. I've considered what he did. I've considered what is happening here. I've considered how evil he was, etc., etc. But this is my decision. Now, your argument does seem that you started on, well, he didn't refer to this fact or that fact or that particular fact. Your Honor, no. I mean, in short, the direct answer to your question is no, the district court does not need to refer to every fact. However, having said that, in this case, the fact that he recanted his testimony and the fact that he also refused to continue his cooperation were things that were so significant in light of the totality of the circumstances that they were mentioning. I recognize that he refused to continue his cooperation. He said that. He did. He said that he terminated. Unfortunately, he terminated too early. He shouldn't have done that. That was the wrong thing for him to do. That's what the judge said. So the judge obviously knows he refused to go on with his cooperation. We're not here to say that the district court needed just to make words on the record in order to make the sentence reasonable. I think the other factor that this court has before it is the fact that three years passed between the first and the second sentencing. What was very clear is that the indictments against Mr. Doha and Mr. Mohammed have been dismissed, and now we have recantations, and yet the sentence was exactly the same without reference to any reasons. And it's for that reason that I point to the failure of the district court to mention these things. It is not because the district court needed to take off a litany. And I might also add in that regard that this is a case that's unique in some respects from the normal case that comes before the court where deference is certainly due and owing to the district court. There's no doubt that Judge Kuhnhauer sat through Mr. Rassam's trial and looked at a variety of pleadings that were filed. It's a massive record. No doubt about that. But what is unique about this case is it's not similar to every other case that the court has before it. This is a terrorism case that was unique in its reach. It's also true that in this case Mr. Rassam did not testify as part of his cooperation in front of Judge Kuhnhauer. That testimony came in New York. And it's also true that much of the cooperation, in fact the cooperation that the district court credits the most, is cooperation with respect to testimony given regarding matters of the training camps in al-Qaeda and so on and so forth that are matters that really weren't directly tied to this case, but rather were matters where the district court wouldn't have necessarily unique information. They're matters where the government's statements in terms of what was unique about Rassam's cooperation and what was not were things that the district court should have credited. The same is true with respect to foreign governments. It's obvious, I think, that what the foreign governments had by way of evidence and what they did not and what they knew and what they did not are things that we have to rely on those statements to provide a basis for the judgment. And that is why I think this is unique. We as a court are still finding our way in terms of what we're supposed to do or what we are going to do in reviewing a sentence under this advisory guideline system. I don't know that the few cases that we have speak with one voice, but what precedent would you point to that should give us the standard for deciding what reasonable means in this context or what's unreasonable? Well, Your Honor, I have obviously made my way through all of the cases, and it's certainly clear that the cases from this court talking about an abuse of discretion standard and the need to find that there was clear error in judgment if this court is to reverse. But I think if one compares Ruff and Whitehead, for example, on the one extreme, and I believe it's, I'm going to butcher the name, but it's Vasquez as the most recent case, I think part of the question revolves around how much deference to give to the district court, how familiar the district court is to the facts and circumstances of the particular case. In the most recent, in the Vasquez case, the issue turned on whether or not the district court properly assessed the age of the conviction in terms of whether or not that conviction should have merited a downward departure because it was 20 years old. I don't know that there's any consistency in these cases, except I think we are all struggling with what it means to give adequate deference to the district court, and certainly we're not bringing this appeal out of lack of respect for Judge Kuhnhauer, but certainly because we believe this sentence was just woefully short. The government argued to Judge Kuhnhauer that he would be released in what, about nine years? That's correct. In July of 2019, as is projected. That's taken into consideration the time that's elapsed since 1999 that he's been in custody. That's correct. It's not clear to me why the government told the judge he's going to be released in nine years. In any of the cases that you've looked at, has either the district court or an appellate reviewing court considered the danger that this individual might pose to the community because of where he is now mentally and what he did before and what he might do in the future? Certainly it would be fair to say that there are cases, such as child pornography cases, where measuring the danger to the community is a factor that the court considers, but I do think this case is unique in the type of danger that Mr. Rassam has presented. I don't know whether I'm answering the court's question. There was a time when he, I'm from Los Angeles, I would say he posed an incredible danger. That's absolutely correct. There was another time when he cooperated with the government for a long period of time, and the court took that into consideration. But then there was a time when he recanted and said that he had lied before. Now, which individual did the court consider in deciding that 22 years was safe enough for the rest of us? The government's position would certainly be that he, Judge Kuhnhauer, considered the individual perhaps that was the middle individual and certainly not the first. Had Mr. Rassam not offered any cooperation, I don't think we would be arguing about the appropriateness of a 65-year-old life sentence. What I don't think the court did consider in the recantation was the impact, and that can't be understated, not just in terms of his danger, but the impact in terms of the government's ability to prosecute others. Mr. Doha, I think, is best described in the defense's own pleadings in terms of his importance and the inability to prosecute him. But by the sentencing hearing in July of 2005, he'd stopped cooperating and there were at least doubts about what was going to happen in the future. That's correct. At that time, the government's position or request was for a sentence of 35 years, which is kind of worlds apart from the guideline range to begin with. There's a lot of time there between 35 and 22, but 22 is a lot of time all by itself. In this case, as such an outlier, it doesn't fit any very clear pattern, but can we say that the departure or the decision of the district court to go to 22 instead of 35 is so far out of the bounds that it's an abuse of discretion? The government itself is asking for only 35 at that point in time? I think, Your Honor, certainly the balance that people were attempting to strike, as I understand it, was between that information that he did provide that could still be used, that was certainly of value. It would have been inappropriate for the government not to recognize that. But I do think there is a difference between 35 years and 22, or 45 later, subject to his recantation, because now we really clearly do know we can't use the information that he provided. And I think that that is very significant, and it also suggests, for example, if I might return for a moment to the recantation, that he's actually attempting to help the very people that he named. What is rather unique about this case is the fact that although he certainly provided testimony with respect to Mr. Harari, if one looks at it, the very people that he named that could be prosecuted solely based on his information were the very people who could not be prosecuted. I'd like to reserve the remainder of my time for rebuttal, if I might. Good morning. My name is Tom Hillier, and I represent Ahmed Rasam, along with Melissa Shook, who is at the council table with me, the Faisa Court Council. Your Honor, just to begin and to move away from prepared script here, Ms. Bruner began by indicating that the court did not consider the recantation in its sentencing decision. And I would refer the court to ER 36 of the sentencing transcript, wherein Judge Kuhnhauer indicated prior to sentencing Mr. Rasam, the court recognizes that Mr. Rasam's later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects, referring to other individuals that the government brought to the court's attention during its pre-sentencing pleadings and also discussed at length during its opportunity to address the court prior to sentencing. So the government's not correct in making that statement. Well, I don't know that the government was saying he wasn't aware of it, but did it play any role in the sentencing decision? If, in fact, the second time around exactly the same sentence was imposed, it doesn't appear to have had much impact. And isn't it something you would expect to at least be more than factually acknowledged? Well, the court went on to say, and I think this is significant because evidence is that he's weighing this matter, however, Mr. Rasam's cooperation, while it lasted, provided our government and the governments of many other countries what he called extensive intelligence that proved to be invaluable in the fight against terrorism, the worldwide fight against terrorism. And I think the government's argument that we should cloister this cooperation to its benefit to the United States is not well taken when we're involved in a situation as we are in this case, a fight against worldwide terrorism, Mr. Rasam's contribution to that. But if you actually look at what Mr. Rasam said at the more recent resentencing, and he basically not simply recanted but disavowed, described that as a departure from what he would have done. He was in impaired mental condition and said all sorts of strange things. I mean, at that time he was electing to represent himself, and it seemed to me he tried to distance himself from his cooperation as much as he possibly could. Do you disagree with that characterization? Well, what Mr. Rasam did was he was complaining that his cooperation, which occurred in his view at a time when he was mentally impaired, was being used as the basis for holding Mr. Wirey in prison. And he explained that he didn't feel that that was appropriate, that somebody's imprisonment should be based upon solid information. So in effect he was, you know, I'm not sure if he's trying to distance himself from his cooperation as much as he was explaining where he was presently in his state of mind and where he was then, and questioning the efficacy of his testimony. That question was presented squarely to the district court in New York by way of a writ of habeas corpus, and later on the Second Circuit Court of Appeals, and both found what he had to do, that Mr. Rasam's recantation was ineffective because it wasn't credible. Well, I understand that, but it seems to me it's a little peculiar to grant what appears to be extraordinary credit for cooperation when the person who provided that cooperation is now in front of the court saying, I didn't mean to do it. I didn't know what I was saying. I retrieve all the statements. And then for the court to suggest it will diminish the likelihood of future cooperation if we don't recognize what he's done and we've got a person who's saying, I didn't mean to do it, it's a disconnect for me. I don't understand how you can give extraordinary credit for cooperation, which is being disavowed at the very moment by the person standing in front of the court. The cooperation that Judge Kunauer was giving Mr. Rasam credit for was cooperation that was done and could not be undone, and the fruits of which were reaped by our government and other governments throughout the world and could never be undone. The intelligence value of which Agent Humphreys testified played enormously in the effort against worldwide terrorism throughout the world. Does that mean a defendant who unwittingly discloses lots of information should get credit for it in his sentence? I mean, the fact that you obtain information from someone does not necessarily reflect acceptance of responsibility or serious cooperation from the person if that person later says it was all a mistake. Well, Your Honor, in effect what you're saying is that Mr. Rasam stepped back, and that's certainly the government's view. Judge Kunauer disagreed with that, and the record does not reflect that in the least. What the record reflects is that Ahmed Rasam made a statement to the court early on, I regret what I did, and I think it was wrong. And he never recanted that statement, and he never said anything during his several moments when he could have where he was personally addressing Judge Kunauer. I recant my – I don't regret what I did. I support what's happening out there. So his unrebutted statement as it was given to the court is, I made a mistake, and I'm sorry for that. At page 38 of the sentencing transcript, Judge Kunauer reflects on what's happening now, what's happening in Mr. Rasam's mind. And this reflection of Judge Kunauer's is drawn from nine years of working on this case and weeks and weeks and weeks of sitting in the same courtroom as Ahmed Rasam. And he said, I'm also persuaded that Mr. Rasam's mental health deteriorated somewhat from the isolation of his confinement, repetitive intensive questioning to which he submitted, and these conditions contributed to the early termination of his cooperation, which Judge Kunauer on page 36 speaks to in terms of that early termination related in dismissal of indictments and recantation. So what he's saying is this man has an issue with his health, mental health, and he drew that information from a comprehensive report prepared by Dr. Stuart Grassian, which is part of the record and was considered by the court. And the court in his sentencing comments referenced Dr. Grassian's report. That report and the observations in it were unrebutted by the government, and the court made, in effect, a finding that Mr. Rasam's mental condition, as reflected in the evaluation of Dr. Grassian, contributed to where he is. And what Dr. Grassian was talking about is Mr. Rasam's history, how it affected choices he made early on to get into this business in the first place, how it affected his withdrawal from that, and how it was affecting his current resistance to continuing to cooperate. This swaying that he went through back and forth on how to deal with his current situation. And that information was compelling in an incredibly comprehensive report, which, again, was unrebutted in part of the factual basis. He also provided an update and suggested a couple of different things in the update. One is that it was Mr. Rasam himself who insisted upon remaining where he was at CTAC, so he may have delayed or exacerbated the situation that he was in at the outset. Then he goes on to say, but finally, with considerable assistance from defense counsel, he's been persuaded to accept the change. And after the change, Dr. Grassian reports he's substantially improved. But Dr. Grassian's report was prepared after all of his visits with Mr. Rasam, his visits at the Seattle Federal Detention Center and also his visits where he was placed later on. And his conclusions were that his current state of mind is an attempt to regain some control, some self-respect, but doesn't reflect upon his dangerousness. And I think this goes to your concern, Judge Alarcon. But, again, Well, let me tell you my concern, and you can address it right. Did the district court consider the impact of the deterioration because of his mental condition as to whether that made him less dangerous upon release or more dangerous upon release? I think what Judge Kuhnhauer believed and what is inherent in his decision is that I feel this person's character is reflected in his decision to cooperate and all of the information that he provided. And I think the reasons why he's and his recantation of that, his involvement in terrorism to begin with, and I believe that he's not a future danger. Where is that reflected? It's not a future danger. It's not reflected in those very words, but it's Shouldn't the court have considered that? Well, Judge did refer to Dr. Grassian's report, in which Dr. Grassian concluded that, in his view, Mr. Rassam's offers little threat to future dangerousness. So I believe that the record supports that, along with Judge Kuhnhauer's take, his measure of Ahmed Rassam, which was drawn from all of this interaction that he had with him through the years that this case has been pending. So the recantation was something he considered. And he weighed, and I think the record, the unrebutted record, is such that he could consider that it was not significant enough to increase the sentence. With respect to the cooperation itself, the real nub of all of this is that the government believes that the court gave him too much credit for the cooperation, and Judge Kuhnhauer himself said that the cooperation weighs heavily in his decision. And it's difficult now, some eight and a half years after it began, to really recreate in real time since what was happening then. But in real time, the buzz in the law enforcement community that was created by Ahmed Rassam's decision to cooperate was loud, and the law enforcement community was excited. And Fred Humphrey's testimony, I think, really underscores that. He gives you a little bit of what the real-time impact was. He talked about how this was the first time. He's a charter member of the Seattle anti-terrorism team. The first time they'd heard anything like this, that headquarters was very interested in getting it and getting it quickly, and that it was disseminated and that his reports were prepared the same day. And they were vigorously disseminated, as he said, throughout the world. And as a result of all of that, people who needed to know were getting information that then turned into arrests throughout Europe that summer. And during the actual course of the interviews, on May 15th, just a couple of days after it began, the whole Southern District of New York prosecution team was interviewing Ahmed Rassam. We know Agent Carl, who's the head of the FBI lab in D.C., came out on May 23rd, which turned out to be a very fortuitous interview because he was able to prevent a potential disaster that was related to the Richard Reed situation. On August 6th, 2001, Ahmed Rassam was quoted in the president's daily brief. This is the significance of that cooperation. And as Bruner's correct, this is a terrorism case, but the testimony was about terrorists. And the fruit in this case was that, as the Germans described in three separate prosecutions, they were able to convict and imprison six different terrorists. And there was just a wave of events that occurred because of this that bore fruit in this fight against international terrorism, which Judge Kunauer considered in deciding that this weighs heavily in my decision. But it doesn't outweigh the fact that he stopped cooperation. It doesn't outweigh his recantation. Apparently it does, though, because you have a sentence that is less than, I mean, if you unpackage the sentence, we've got a mandatory consecutive sentence of ten years, so if you look at the piece that was given for the terrorism charges themselves, it is a tiny fraction of the guideline range. We're looking like 20 percent or something like that. Well, Your Honor, I don't think we can unpackage that. Certainly Ahmed Rassam can't. In the end of this weighing process, what Judge Kunauer concluded was 22 years in prison, 22 years imprisonment for what he did. So that's what the court considered after all of this interaction. And it seems to me, when you look at Gall and Cardian, there's a great deal of debate in the Ninth Circuit. I read the Whitehead Embankment Dissent. When you figure out what a rule is, let me know. Well, I mean, I looked at Whitehead dissents and was struck. You know, these are legitimate dissents. There was a cursory review here, and the facts for the departure, you know, they're not compelling. Then you look at Gall. You know, the underlying case and the Gall decision from the Supreme Court, and what you have are some compelling facts that justify the deviation in that case and a comprehensive recitation by that court. And in terms of sort of the math of it all, the Court of Appeals complained, well, you didn't really consider seriousness because, as you would indicate, Judge Clifford, you can't see that in this sentence of zero imprisonment. So how can we say you considered seriousness? How can we say you considered disparity when there's zero here? What the Supreme Court said is we reject that. We reject this mathematical analysis, this rigid sort of formulistic sort of approach. It said that you, the Court of Appeals, must defer to the court where it gives you a reasoned analysis of why it arrived at what it was and that while we reasonably might disagree or you may reasonably disagree with the ultimate result achieved by Judge Kuhnauer, that is not a basis for reversing. So if there are no further questions, I've used up my time. We're very close to it. Thank you. Thank you. I will be brief. I think there's a couple of points to be made here. First of all, with respect to Ahmed Rassam's cooperation, certainly it was about terrorism, but I don't think you can just simply look at statements about the camps and information that is general in nature that certainly was intelligence value without discounting or also considering the impact of his failure to complete his cooperation and his recantation had in terms of not only the prosecutions that have been charged, but future prosecutions that might have been possible had he continued to cooperate and had we been able to find these individuals. More importantly, I think when we talk about an assessment of Rassam's character, there's a couple of things that seem to get lost in the shuffle here. First of all, Mr. Rassam did not choose to cooperate until after his trial. I think that's a very important point, and he certainly never mentioned when the inspectors were shaking the bottles, not knowing what was in them, never mentioned what he was dealing with. But more importantly, if one looks at his letter to the court, which is the only statement of his remorse in his statement to the court as to why he cooperated, that letter is dated February 17, 2003. And in that letter, aside from talking about not getting the miracle at trial that he was hoping for, Mr. Rassam actually affirmatively says in that letter, I will continue to cooperate even after sentencing. I made an agreement with the government and I made a change. That's important because nine days later the government filed its 5K motion, which in the pre-Brooker era meant he could get a sentence below the guideline range. And by April 2003, it was quite clear he was not cooperating. So whatever that letter meant, that letter certainly didn't mean that he meant to arrive at his bargain. And so I don't think, I think that's also a measure of Mr. Rassam to be taken, considered along with his recantation. In summary, this is a case where his victims were innocents, or his intended victims, I should say. He cooperated only after we succeeded in marshalling the evidence necessary to convict him of all the charges, not just the easy ones, which would have been the smuggling ones. He withdrew his cooperation once he received his 5K motion. He withdrew his cooperation before it could be used in any way to prosecute any other individuals that were hinged, where the prosecution hinged entirely on his information, and he recanted those statements. In light of all of those factors, the 22-year sentence, long in any other context, is just woefully short and we believe plainly unreasonable and would respectfully ask this Court to vacate the sentence and remand. Thank you. Thank both counsel for their very informative arguments. That concludes our calendar for the morning, and we are adjourned.
judges: Alarcon, Fernandez, Clifton